FILED
2013 Oct-21 PM 03:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **TIMOTHY STANLEY LYNN,** et al, | ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) **Case No.: 1:11-CV-2904-VEH** ) |
| **FORT MCCLELLAN CREDIT UNION, et al,** | ) ) ) |
| **Defendants.** | ) ) |

---

## <u>MEMORANDUM OF DECISION</u>[1]

This is an action arising out of the purchase, by Timothy Stanley Lynn ("Mr. Lynn"), of a 2003 Chevrolet Cavalier automobile. After Mr. Lynn was in Chapter 13 bankruptcy proceedings, he filed this action as a non-core Adversary Proceeding against WT Enterprises, LLC, d/b/a/ Family Nissan ("Family Nissan") and Fort McClellan Credit Union ("Credit Union").[2] (Doc. 1-1).[3] Mr. Lynn sought a

---

[1]No trial transcript having been filed in, this Memorandum of Decision was prepared based on the undersigned's recollection and trial notes, the exhibits admitted at trial, and the pleadings of record in this case.

[2]Family Nissan and Credit Union are hereinafter sometimes collectively referred to as the "Defendants."

[3]References to documents in the court docket are referred to by their cm/ecf number, *e.g.* Doc. 1-1. References to exhibits introduced at trial are referred to by their trial exhibit number, *e.g.* Def.'s Ex. 101A. Both parties agreed to use Defendants' exhibits at trial.

declaratory judgment against the Defendants for liability and for monetary relief under the Truth in Lending Act, 15 U.S.C.A. §§ 1601 *et seq*. ("TILA"). (*Id*.). Mr. Lynn also asserted, against Family Nissan only, a claim for violation of the Alabama Deceptive Trade Practices Act, Code of Alabama 1975, Sections 8-19-1 *et seq*. A one day bench trial was held on July 24, 2013, before the undersigned judge. Post trial briefs have been filed by all parties.

Pursuant to Rule 52, Fed.R.Civ.P., the Court now finds the facts specially and states separately its conclusions of law thereon.

## FINDINGS OF FACT

### A.    The Parties

The plaintiff is Mr. Lynn. The Defendants are Family Nissan and Credit Union.

### B.    The Transaction

On June 29, 2009, Mr. Lynn attended a tent sale on the grounds of the former Fort McClellan. Family Nissan offered him a price on a 2003 Chevrolet Cavalier automobile. Mr. Lynn countered at "a little over $5,000." Family Nissan accepted. Mr. Lynn didn't sign any papers or receive the car that day because the car needed work. Mr. Lynn was shown a copy of Def.'s Ex. 101B, the internal document of Family Nissan dated June 29, 2013, that was turned in by the salesman to Family Nissan's finance office for them to prepare the Retail Purchase Agreement (Def.'s Ex.

2

101A) and the Retail Installment Contract and Security Agreement (Def.'s Ex. 102).

The next day, June 30, 2009, Mr. Lynn met the Family Nissan salesman at the WalMart in Jacksonville, Alabama. At that time, he got the paperwork and the car. Also on that day, he signed Def.'s Ex. 101A, entitled Retail Purchase Agreement, and Def.'s Ex. 102, entitled Retail Installment Contract and Security Agreement. Both documents are dated June 30, 2009. Mr. Lynn does not dispute that he was given a copy of those documents. Mr. Lynn did not read Def.'s Exs. 101A or 102, although each document says he agrees to its terms and Def.'s Ex. 102 also says, in all caps and boldface type right above Mr. Lynn's signature, that it is important to "thoroughly read" the document before signing it. Mr. Lynn can read, and he demonstrated to the court, by reading documents, that he is able to read. What was important to him on June 30, 2009, was the total amount he paid, **and that amount was correct on the documents**.

Mr. Lynn agrees that he was not mislead by Def.'s Ex. 101A or Def.'s Ex. 102, "other than the fact that the lines didn't line up." He learned that the lines didn't line up about the time that he filed for bankruptcy.[4] The court agrees that, given Mr. Lynn's repeated testimony that the amount of money he negotiated to pay was

---

[4]According to the Bankruptcy Docket Sheet, doc. 1-6 in this court's file, Mr. and Mrs. Lynn's bankruptcy proceeding was initiated on February 9, 2010. The court takes judicial notice of such date.

3

correctly stated on the documents, Mr. Lynn was not in fact mislead.

Def.'s Ex. 101B, the internal document of Family Nissan dated June 29, 2013, that was shown to Mr. Lynn on June 29, 2013, was turned in by the salesman to Family Nissan's finance office for them to prepare the Retail Purchase Agreement and a Retail Installment Contract and Security Agreement. The Retail Installment Contract and Security Agreement form used for Mr. Lynn's transaction was the form approved by the Credit Union, as the Credit Union had agreed to have the loan assigned to it.

The tent sale salesman, Bruce Burton, testified. He has been employed by Family Nissan for four years and nine months, and has been selling cars for eighteen years - about 150 cars per year. He did not remember meeting with Mr. Lynn at WalMart on June 30th, but he did remember the June 29th tent sale transaction with Mr. Lynn. The transaction was negotiated between him and Mr. Lynn. He created Def.'s Ex. 101B. He showed it to Mr. Lynn. He explained all of it to Mr. Lynn, including the $399.00 processing fee.

Family Nissan's finance manager, Andy Cotton, testified that he looked at Def.'s Ex. 101B the "next day" (that is, July 1, 2009), that the processing fee appears on all documents of this type, that some of the processing fee goes toward the preparation of the Truth in Lending Act disclosures, that the processing fee was set

4

by Family Nissan and could not be changed by Mr. Cotton, that the processing fee was always (at that time) $399.00, and that Def.'s Ex. 101B is used by Family Nissan to create Def.'s Ex. 101A. He also testified that the doc. fee is not preprinted on Def.'s Ex. 101A. June 30, 2009, was a Tuesday. Tuesdays were Mr. Cotton's day off in 2009. Another employee "covered for" Mr. Cotton on Tuesdays in 2009. That employee is no longer with Family Nissan.

Although Mr. Cotton reviewed Def.'s Ex. 102 on July 1, 2009, he did not notice the misalignment. If he had noticed it, he would have reprinted the document and have had the customer come in and sign the reprinted version. There were procedures in place in 2009 to avoid errors. He did (and does) everything the same way every time to avoid mistakes. The misalignment of Def.'s Ex. 102 was a mistake that was missed. Nine and one-half times out of ten, mistakes like the one on Def.'s Ex. 102 get caught. This is the only misalignment mistake that Mr. Cotton knows of that did not get "caught before it went to the bank." It appears to Mr. Cotton that the wrong code was entered when Def.'s Ex. 102 was generated and that, as a result, the computer "program didn't match up to the form put into the printer." At all times relevant to this case, Family Nissan used an ADP computer software program to take the data input by Family Nissan's finance office employees and input it into the appropriate (as designated by the code selected and entered by the Family Nissan

5

employee) sales contract and security agreement.  At all times relevant to this case, Family Nissan paid a company to make sure that the forms align correctly when they print.

Def.'s Ex. 101A and Def.'s Ex. 102 must match. The computer software will not allow a person such as Mr. Cotton to change Def.'s Ex. 102 unless he also changes Def.'s Ex. 101A.

There are occasional misprints on forms. As of June, 2009, Mr. Cotton had seen forms print misaligned. He has known banks to reject forms prepared by Family Nissan.

The "grand total price" shown on Def.'s Ex. 101B was $5,512.60, which is the total amount that Mr. Lynn had negotiated to pay. This same amount is shown as the "total due" and the "unpaid balance due" on Def.'s Ex. 101A. This is also the total amount that was financed.[5] Mr. Lynn did not make any down payment toward the purchase price. The court credits Mr. Lynn's testimony that what was important to him on June 30, 2009, was the total amount he paid, **and that amount was correct on the documents he signed on June 30, 2009**.

_____

[5]To the extent that Mr. Lynn, in response to a leading question by his attorney on re-direct, contradicted his initial testimony to state that he thought the agreed price was $4,950 plus tax and title, the court finds Mr. Lynn's initial testimony credible and his contradiction of that testimony not credible.

In the section of Def.'s Ex. 102 entitled "ITEMIZATION OF AMOUNT FINANCED," there are a series of descriptive words, followed by lines that are either filled in with dollar amounts or the abbreviation N/A. Of importance to this case, **the first time a dollar amount appears in this section is two lines (or hard returns) above the section caption**. This is totally consistent with Defendants' unrebutted testimony that the preprinted form for Mr. Lynn's transaction was printed in a misaligned, but otherwise accurate, manner and, as a result, all the information on Def.'s Ex. 102 in the portion below the words TRUTH IN LENDING DISCLOSURES is printed **two lines higher** than the information should have appeared. Further, an inspection of the document shows such misalignment. Finally, Mr. Lynn and his counsel do not dispute that such a misalignment occurred. In fact, at trial, all parties stipulated that the numbers on Def.'s Ex. 102 are printed two lines higher than they should be. Finally, in his post-trial brief (doc. 36), plaintiff concedes that this misalignment was an error - that is, done accidentally and without any intent to deceive.[6]

Family Nissan personnel prepared all three documents. Other than signatures,

---

[6]"Lastly, in response to the Defendants['] assertion that the Bona Fide Error Affirmative Defense shields them from liability, Lynn submits that Defendant[s] have failed to prove the 2nd part of that defense - that either [of them] had reasonable procedures in place adapted to avoid such errors." (Doc. 36, p. 7).

all of Def.'s Exs. 101A and 102 are either preprinted forms, or are typed (whether manually or by computer) additions to those forms. In contrast, all of Def.'s Ex. 101B is a preprinted form, with every additional piece of information on it, **other than the processing fee of $399.00** (which is typed), handwritten on it. This processing fee is explained on the form as "This is a fee to cover Dealer's overhead cost & profit."

Mr. Burton, the Family Nissan salesman, went over Def.'s Ex. 101B with Mr. Lynn on June 30, 2009, including explaining the processing fee. He does this with every customer. There is no fee entitled a "processing fee" on Def.'s Ex. 101A. However, there is a **$399.00 charge** shown on that document, entitled "DOC FEE."

On Def.'s Ex. 102, on the first page, it states "☐ You agree to pay a processing fee of $  N/A  ." The unrebutted testimony at trial was that this section of the form is **always** completed by filling in "N/A", which stands for "not applicable," unless the Credit Union charged a processing fee **in addition to** the processing fee charged by the dealer.[7] Because of the printer misalignment, Def.'s Ex. 102 does not show that there was a processing fee paid to Family Nissan. That processing fee, which was established to be $399.00, and which was shown on Def.'s Ex. 101B and was explained to Mr. Lynn on June 30, 2009, as a processing fee paid to Family Nissan,

---

[7]There is no evidence or argument that the Credit Union charged Mr. Lynn a processing fee in addition to the processing fee charged by Family Nissan.

should have appeared in the line on Def.'s Ex. 102 entitled "Processing Fee Paid to Seller." However, there is nothing at all written on the line to the right of those words. Instead, **two lines up**, next to the words "Insurance Premiums," the amount of **$399.00** is filled in, although Mr. Lynn did not agree to pay any insurance premiums. But for the accidental misalignment when printing Def.'s Ex. 102, there would be no issue of "insurance premiums." The total amount that the documents show that Mr. Lynn was obligated to pay was the amount that he agreed to pay.

### C.    The Credit Union

The written agreement between the Credit Union and Family Nissan pursuant to which Credit Union members such as Mr. Lynn can finance the purchase of an automobile from Family Nissan is set out in Def.'s Ex. 109. Under that agreement, the Credit Union purchases qualifying loans from Family Nissan.

The established practice of the Credit Union, as to such loans made through Family Nissan, is for the individual borrower (here, Mr. Lynn) to fill out a loan application at the dealership. Mr. Lynn did that. The loan application is Def.'s Ex. 105. Family Nissan faxes the application to the Credit Union. The Credit Union either approves or disapproves the application. All of Mr. Lynn's loan documents were completed by Family Nissan employees.

After the loan application is approved by the Credit Union, the finance office

of Family Nissan prepares the Retail Purchase Agreement (Def.'s Ex. 101A) and forwards it to the Credit Union after it is signed. The Family Nissan finance office prepares the Retail Purchase Agreement from its internal document (Def.'s Ex. 101B). Family Nissan's finance office also prepares the Retail Installment Contract and Security Agreement (Def.'s Ex. 102) and forwards it to the Credit Union after it is signed. The numbers on the Retail Installment Contract and Security Agreement (Def.'s Ex. 102) are taken from the numbers on the Retail Purchase Agreement (Def.'s Ex. 101A).

There is no discrepancy between the numbers themselves. The only discrepancy is the one that arose from the mechanical misalignment of the data vis-a-vis the preprinted form when Def.'s Ex 102 was generated for this transaction.

The Credit Union employee who testified did not personally look at Mr. Lynn's documents until after Mr. Lynn took bankruptcy. She has seen a misalignment error like this before, caused either by a printing error or a computer programming code entry error.

The $399.00 shown on Def.'s Ex. 102 as "insurance premiums" would have correctly shown, but for the misalignment, as "processing fee paid to seller" and there would have been no dollar amount shown for "insurance premiums." On Def.'s Ex. 101A, the $399.00 charge is identified as a "doc. fee." The file contains an

10

"Agreement to Provide Insurance Form," signed by Mr. Lynn and dated June 30, 2009. It is Def.'s Ex. 107. Def.'s Ex. 107 would not apply to anything except full coverage for comprehensive and collision, with a $500 maximum deductible for each.

The words "doc fee" are not defined on Def.'s Ex. 101A.

The words "doc. fee" do not appear on Def.'s Ex. 102.

"Processing fee" is not defined on Def.'s Ex. 102.

A Credit Union loan officer verifies: (1) that the amount financed ( $5,512.60), as shown on the Retail Installment Contract and Security Agreement (Def.'s Ex. 102) "matches" the "buyer's order" and the Retail Purchase Agreement (Def.'s Ex. 101A); and (2) that the contracts are signed. The Credit Union then "purchases the loan" from Family Nissan. A loan officer should review the documents to see if the Truth in Lending Act disclosures are legible. The Credit Union loan officer who testified stated that the numbers on Def.'s Ex. 102 are "not acceptable but are legible to [her]." The court agrees that the numbers are legible. Indeed, everyone in the trial referred to those numbers throughout the trial.

Def.'s Ex. 102 shows the annual percentage rate of 5.75 percent. This is also the loan rate.

## CONCLUSIONS OF LAW

**1.     The Defendants Have Established Their Bona Fide Error Affirmative Defense.**

Mr. Lynn has asserted various TILA violations by the Defendants in regard to the automobile purchase financing transaction that is the subject of this action. (Plaintiff's Post Trial Brief, doc. 36). The Defendants have asserted the "bona fide error" affirmative defense set out at 15 U.S.C. § 1640(c). (Amended Pretrial Order, doc. 28, p.3). Mr. Lynn acknowledges that this defense, if established, is a defense to all of his TILA claims. (Doc. 36, p. 7). He further acknowledges that the Defendants have proved all the elements of that defense except the element that the Defendants, or at least one of them, "had reasonable procedures in place adapted to avoid such errors." (*Id*.).

15 U.S.C.A. § 1640(c) reads as follows.

(c) Unintentional violations; bona fide errors

A creditor or assignee may not be held liable in any action brought under this section or section 1635 of this title for a violation of this subchapter if the creditor or assignee shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error. Examples of a bona fide error include, but are not limited to, clerical, calculation, computer malfunction and programing, and printing errors, except that an error of legal judgment with respect to a person's obligations under this subchapter is not a bona fide error.

15 U.S.C. § 1640(c).

Federal courts that have addressed this affirmative defense have repeatedly held that, in order to be entitled to the protection of this defense, the defendant must **have and maintain** procedures which serve as "a safety catch or rechecking mechanism." *See Palmer v. Ameribanq Mortgage Group, LLC*, 2010 WL 3933273, 11 (E.D.Pa.) (E.D.Pa., 2010) (collecting cases).

The court finds that the facts set out above and summarized in this paragraph show that Defendants had reasonable procedures in place adapted to avoid such errors and that Defendants maintained such procedures. Specifically, Family Nissan used ADP's computer software to avoid TILA violations. The Family Nissan finance office employee could not change Def.'s Ex. 102 unless he also changed Def.'s Ex. 101A. The salesman went over the internal worksheet (Def.'s Ex. 101B) with each buyer, including Mr. Lynn, and explained all of the charges, including the $399.00 processing fee. The Family Nissan finance office prepared the Retail Purchase Agreement (Def.'s Ex. 101A) from the salesman's internal worksheet (Def.'s Ex. 101B). The dollar amounts on the Retail Installment Contract and Security Agreement (Def.'s Ex. 102) came from the Retail Purchase Agreement. They could not differ. The dollar amounts shown on both these exhibits were correct and as negotiated by, and explained to, Mr. Lynn. The Retail Installment Contract and Security Agreement

printed two lines higher than it should have due to a human error in inputting the code for the form to be printed. The Retail Installment Contract and Security Agreement was reviewed by another person in Family Nissan's office (different from the person who printed the form) the next day, but the misalignment error was not caught by that reviewer. If the error **had** been caught, Mr. Lynn would have been asked to come in and sign a correctly printed/aligned document. A Credit Union loan officer also was tasked with reviewing the Retail Installment Contract and Security Agreement. The numbers on the Retail Installment Contract and Security Agreement were legible and the terms were as explained to Mr. Lynn.

Accordingly, the court find that judgment is due to be entered in favor of the Defendants and against Mr. Lynn as to his TILA claims.

## 2.   Mr. Lynn Has Failed To Establish a Prima Facie Case under the Alabama Deceptive Trade Practices Act.

The Alabama Deceptive Trade Practices Act ("ADTPA") is set out at Code of Alabama 1975, Sections 8-19-1 et seq. The ADTPA provides a private right of action at § 8-19-10.

(a) Any person who commits one or more of the acts or practices declared unlawful under this chapter **and thereby causes monetary damage** to a consumer, and any person who commits one or more of the acts or practices declared unlawful in subdivisions (19) and (20) of Section 8-19-5 and thereby causes monetary damage to another person, shall be liable to each consumer or other person for:

(1) Any actual damages sustained by such consumer or person, or the sum of $100, whichever is greater; or

(2) Up to three times any actual damages, in the court's discretion. In making its determination under this subsection, the court shall consider, among other relevant factors, the amount of actual damages awarded, the frequency of the unlawful acts or practices, the number of persons adversely affected thereby and the extent to which the unlawful acts or practices were committed intentionally; and

(3) In the case of any successful action or counterclaim to enforce the foregoing liability or in which injunctive relief is obtained, the costs of the action or counterclaim, together with a reasonable attorney's fee. On a finding by the court that an action or counterclaim under this section was frivolous or brought in bad faith or for the purpose of harassment, the court shall award to the defendant (or counterclaim-defendant) reasonable attorney's fees and costs.

Code of Alabama 1975, Section 8-19-10.

Because it is so short and, frankly, so woefully deficient, the court sets out below the entirety of Mr. Lynn's argument regarding his ADTPA claim, as set out in his Post Trial Brief (doc. 36).

Family Nissan unfairly or deceptively represented the Sale Price of the vehicle to Lynn, understating same by $399.00, by including that charge denominated on the Bill of Sale (without explanation) as a Doc Fee and asserts by its Answer and arguments that it is a "processing fee" (also without any written explanation) for creating documents in the Lynn transaction, including, but not limited to, the Truth in Lending disclosures. Plaintiff avers that the act of surreptitiously hiding the sale price of the vehicle by denominating a portion thereof as a separate fee is unfair and deceptive and in violation of the ADTPA, §8-19-5(5),(27), Code of Alabama, 1975, as amended.

Ala. Code §8-19-6 references and gives great weight to the Federal

> Trade Commission decisions and policy under 15 U.S.C.. [sic]. The FTC has published policy statements for what is "Unfair" and what is "Deceptive" in trade. These are attached.

(*Id*.).

Mr. Lynn's counsel attached to his Post Trial Brief, **without any more specifics**, **thirty-eight pages** of FTC policy statements. This "argument by attachment" is simply insufficient to put this court on notice of the **federal** authority upon which Mr. Lynn relies in support of his **ADTPA claim**. "Courts are not obligated to read a party's mind or to construct arguments that it has failed to raise and that are not reasonably presented in the court file." *Jones v. Pilgrim's Pride, Inc.* 741 F.Supp.2d 1272, 1275 (N.D.Ala.,2010) *(*citing *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir.1995) ( "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it ...."); also citing *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 260 (1st Cir.1999) (declaring that a "party who aspires to oppose a ... motion must spell out his arguments squarely and distinctly, or else forever hold his peace," as district court may ignore arguments not adequately developed by nonmovant)).

Turning to the ADTPA itself, the court notes Mr. Lynn has pointed to absolutely **no** damages incurred. In fact, Mr. Lynn testified that he signed the documents at issue (although he did not read them), he negotiated the price, and **he**

**agreed to the "total price" shown on all the documents, $5,512.60**. The court credits Mr. Burton's uncontroverted testimony that he showed Def.'s Ex. 101B to Mr. Lynn and went over everything, including the $399.00 fee, with Mr. Lynn, and that Mr. Lynn agreed to everything, "but at a lower total," that is, $5,512.60 instead of $6,586.34.

Since Mr. Lynn proved no monetary damages, he has no claim under the ADTPA against Family Nissan. Accordingly, judgment is due to be entered in favor of Family Nissan and Mr. Lynn on his ADTPA claim.

Alternatively and additionally, Mr. Lynn has not show any intent by Family Nissan to deceive him, or that he was in any way deceived. The court finds *Jackson v. CIT Group/Sales Financing, Inc.*, 630 So.2d 368 (Ala. 1993) instructive. In *Jackson*, the Alabama Supreme Court affirmed the trial court's grant of summary judgment in favor of the defendant on the plaintiff's ADTPA claim under the same language now found at § 8-19-5(27), that is, that the defendant engaged "in any other unconscionable, false, misleading or deceptive act or practice in the conduct of trade or commerce." It is clear from the statute and from *Jackson* that, absent any fraud or actual misrepresentation by Family Nissan, and absent any in-fact deception of Mr. Lynn, Mr. Lynn's ADTPA claim fails. The court finds that, although Family Nissan was undisputedly "in the conduct of trade or commerce" in entering into the

transaction with Mr,. Lynn, Family Nissan's affirmative defense under the TILA, particularly when coupled with the fact that Mr. Lynn got exactly what he thought he was getting, negates any claim under the ADTPA against Family Nissan for any "unconscionable, false, misleading or deceptive act or practice." Accordingly, for this alternative reason, judgment is due to be entered in favor of Family Nissan and against Mr. Lynn on his ADTPA claim.

A separate Final Judgment Order will be entered accordingly.

**DONE** this 21st day of October, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

18